30 F.3d 139
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Louise HICKS, Plaintiff-Appellant,
v.
COUNTY OF LOS ANGELES; Dept. of Health Serv.; David
Gallegos, Defendants-Appellees.
 No. 92-56538.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 4, 1994.
Decided Aug. 4, 1994.
 
 1
 Before: BROWNING and FLETCHER, Circuit Judges, and FITZGERALD,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Louise Hicks appeals the district court's judgment following a bench trial in favor of Los Angeles County and other defendants in Hicks's Title VII action. We have jurisdiction and we affirm.
 
 
 4
 * Louise Hicks is a forty year old African American employee of Los Angeles County. She has been employed by the County for over nineteen years and has worked in computer services positions in various branches of the County's health services and hospitals. In 1984 she transferred to the Information Systems Department (IS) at Rancho Los Amigos Medical Center (Rancho). Her position was Data Systems Analyst I (DSA I) and her supervisor was David Gallegos, the Chief Information Officer in IS and a defendant in this case. Hicks subsequently was promoted to the position of Data Systems Analyst II (DSA II), and then again promoted to the position of Data Systems Coordinator (DSC). At the time of the events in question, her employment level was DSC. She was the supervisor of the End User Computing group, one of four groups in IS.
 
 
 5
 Between May 1986 and November 1988, Hicks filed three grievances against Gallegos with the Employee Affirmative Action Advisory Council. The first grievance, which was filed in 1986, alleged that Gallegos had promised Hicks a promotion from DSA I to DSA II and had subsequently awarded the position to Alan Handler, a Caucasian. Her promotion to DSA II occurred after this grievance and resulted from the grievance proceeding. In June 1988, Hicks filed a second grievance against Gallegos which alleged that he engaged in retaliatory and discriminatory acts against her. It is not clear how this grievance was resolved.
 
 
 6
 In August 1988, Hicks and her coworker Paulette Wince met with Gallegos to express concern about a lack of promotional opportunities. At this meeting, Gallegos allegedly stated that, "You people are always trying to get ahead at the expense of others." Gallegos denies making this remark. Hicks contends that in November 1988 Gallegos told her that she would be sorry for filing the grievances. Hicks subsequently filed her third grievance in November 1988. In this, she accused Gallegos of taking retaliatory action against her for her earlier grievances and of giving her a substandard performance evaluation. This grievance resulted in a slight modification of the performance evaluation.
 
 
 7
 In January 1989, several employees, including Hicks, submitted an affirmative action complaint which alleged that Gallegos created an abusive and hostile environment for his employees.
 
 
 8
 In February 1989, the Human Resources Director at Rancho, Joseph Reyes, distributed a job announcement for a Data Processing Manager I (DPM I) position in IS. Hicks applied for this position but was not interviewed. As the senior employee in IS, Gallegos was responsible for interviewing the applicants and filling the position. One employee, Arnold Towns, testified that he was interviewed for the position even though he did not apply.
 
 
 9
 In June 1989, Lynn Butcher, a Caucasian, was hired into IS. According to Hicks, Butcher was hired into the DPM I position. According to the County, Butcher was hired into the position of Senior Staff Analyst, a position for which Hicks did not apply.
 
 
 10
 In May 1989, approximately one month before Butcher was transferred to IS, Hicks sought a promotion to the position of the Head of the Management Information Center. As part of her application, Hicks was required to obtain an Appraisal of Promotability ("AP") from Gallegos. Gallegos gave her a score of 75, a passing score, but a score that Hicks felt was unfairly low. In the past, Hicks had received a score of 90 on an AP. The AP did not have the signature of Gallegos's superior as is required by County rules. Hicks contends that the low score on her AP precluded her from being considered for the position of Head of the Management Information Center.
 
 
 11
 From June 1989 to February 28, 1990, Hicks took an authorized medical leave. When she returned to work, her office had been moved to a smaller cubicle, and her responsibilities as Head of the End User Computing Section had been substantially curtailed. Gallegos was responsible for moving Hicks out of her office. At trial, the County argued that during Hicks's absence the entire IS section had been reorganized and it was decided that End User Computing no longer needed a supervisor at Hicks's level, only clerical staff. The County argued that Hicks had been moved from her office because she no longer had staff and offices were only given to employees with supervisory positions. Hicks contends that in the past employees occupied offices without having staff report to them.
 
 
 12
 At this time, Hicks was instructed to work on Hospital Materials Management System (HMMS) audit recommendations. The HMMS work was relevant to the Materials Management (MM) group. Before Hicks had gone on sick leave, she had been the HMMS coordinator. At times this work had comprised up to 75% of her work, although at other times this work comprised very little of her work.
 
 
 13
 In May 1990, Hicks was temporarily transferred from IS to MM. On previous occasions Hicks had objected to working in MM, and Hicks believed that this transfer was retaliatory based on her earlier grievances. The County suggests several reasons for the transfer. First, on her return from medical leave, Hicks was subject to temporary work restrictions which precluded her from having interpersonal contact with Gallegos.[1] Second, a request had been filed by Keith Kovach, an employee in MM, requesting that the HMMS Coordinator position (i.e., Hicks) be located in MM in order to ensure that the position be entirely dedicated to that function. At this time many employees were leaving MM and it appeared likely that the department would undergo further contractions. Hicks felt that her skills were not suited to work in MM and that the position was a dead-end job.
 
 
 14
 Later that year Hicks's temporary work restrictions became permanent and her temporary transfer to MM became permanent.
 
 
 15
 On January 31, 1991, Hicks filed a complaint in federal district court under Title VII, alleging employment discrimination by Rancho, the County, the Department of Health Services (a unit of the County), and Gallegos. At trial, the parties stipulated to limiting potential liability to events that occurred after January 1, 1989. Several issues were before the district court: (1) whether the non-appointment of Hicks to DPM I was due to retaliation or discrimination; (2) whether the AP score given to Hicks was a retaliatory or discriminatory action; and (3) whether the transfer to MM, the loss of the office, and other events were the result of discrimination or retaliation.
 
 
 16
 The district court held a bench trial on September 15-17, 1992. On November 30, 1992, the district court entered judgment in favor of the defendants. The court found (1) that there was insufficient evidence that anyone was promoted to DPM I; (2) that Butcher was hired as a Senior Staff Analyst, a position for which Hicks did not apply; (3) that there was no evidence of discrimination in the hiring of Butcher; (4) that Hicks would have been an inappropriate candidate for that position because she would have been a poor "buffer" between Gallegos and the staff; (5) that there was insufficient evidence of discrimination or retaliation by Gallegos in making the AP and other evaluations; (6) that the transfer to MM was due to work restrictions and not discrimination or retaliation; and (7) that the office reassignment was a de minimis occurrence. Hicks timely appealed.
 
 II
 
 17
 The district court's findings of fact in a Title VII case are reviewed for clear error. Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). Findings as to discriminatory intent are findings of fact subject to clear error review. Id.; Edwards v. Occidental Chem. Corp., 892 F.2d 1442, 1447 (9th Cir.1990). Whether an employer's justification for differential treatment is pretextual is reviewed for clear error. Saint Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742, 2756 (1993); Edwards, 892 F.2d at 1448.
 
 
 18
 Hicks's primary claim on appeal is of disparate treatment based on gender, race, or retaliation. In order to establish such a claim, Hicks must prove that the defendants' acts were intentionally discriminatory. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Disparate treatment can be established by circumstantial evidence adequate to create an inference that an employment decision was based on impermissible criteria. Jauregui v. City of Glendale, 852 F.2d 1128, 1134 (9th Cir.1988).
 
 
 19
 In Burdine, the Supreme Court described the appropriate order and burden of proof in disparate treatment cases. 450 U.S. at 252-53. First, the plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence.[2] If the plaintiff is successful, the burden shifts to the defendant to articulate a "legitimate nondiscriminatory reason" for the decision adverse to the employee. Once the defendant meets this burden, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are merely a pretext for discrimination. Although the burden of production shifts between the parties, the burden of proof always remains with the plaintiff. Id.
 
 
 20
 On appeal, Hicks challenges the district court's findings regarding (1) her non-promotion to the DPM I position; and (2) the low score on the AP she received from Gallegos. Hicks does not appeal the district court's ruling with respect to her transfer into MM or the loss of her office on her return to work from medical leave.[3]
 
 III
 
 21
 Hicks contends that she was denied appointment to the DPM I position due to discrimination based on race, sex, or retaliation. The district court ruled against Hicks on this issue on the grounds that Hicks failed to prove that anyone was promoted to the position of DPM I. The district court instead found that Lynn Butcher was hired into the position of Senior Staff Analyst, a position for which Hicks did not apply. The court alternatively found that there was insufficient evidence of discriminatory intent.
 
 
 22
 The fundamental issue in this case is whether Lynn Butcher was hired into the DPM I position for which Hicks applied. If she was not, then the County could not have discriminated against Hicks when it hired Butcher because Hicks applied only for the DPM I position.
 
 
 23
 The evidence is unclear as to whether Butcher was hired into the DPM I position. It clearly demonstrates that the DPM I position was advertised in February and March 1989, that Hicks applied for the position, and that several candidates were interviewed for the position. Moreover, Butcher's promotion was announced in May 1989, soon after the DPM I position was advertised. Several documents that accompanied Butcher's transfer could be read to suggest that she was hired into the DPM I position. In addition, the description of the advertised DPM I position is virtually identical to Butcher's described responsibilities.
 
 
 24
 However, in response to this evidence the County asserted that the DPM I position was never filled and that Butcher was hired on as Senior Staff Analyst, a position at the level of Data Systems Supervisor II (not DPM I). Several witnesses for the County testified that after the DPM I position was advertised, the funding for the position was revoked and transferred to another hospital. The County also noted that Butcher was hired into a "buffer" position, which was designed in part to reduce disharmony between Gallegos and the employees he supervised. Thus, the County notes that Hicks did not apply for this position but even if she had, she would not have been well-suited for the job because she had a poor working relationship with Gallegos. Although several documents suggest that Butcher was hired as a Senior Staff Analyst, there is no documentary evidence that the DPM I position was revoked.
 
 
 25
 In light of this conflicting evidence, we cannot conclude that the district court was clearly erroneous in finding that Butcher was not hired into the DPM I position. Because we conclude that this finding was not clearly erroneous, we must assume that Butcher was hired as Senior Staff Analyst, a position for which Hicks did not apply. It is therefore unnecessary for us to consider whether the County acted with discriminatory intent when it hired Butcher into IS.[4]
 
 IV
 
 26
 Hicks appears to raise a claim of disparate impact due to excessively subjective employment practices. A disparate impact claim challenges " 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.' " Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1480 (9th Cir.1987) (citation omitted). A plaintiff need not prove discriminatory intent in an disparate impact case because the court is concerned with "the consequences of employment practices, not simply the motivation." Id. (quoting Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971)). The plaintiff must instead prove discriminatory impact. Rose v. Wells Fargo & Co., 902 F.2d 1417, 1421 (9th Cir.1990).
 
 
 27
 To establish a prima facie case of disparate impact, the plaintiff must: "(1) identify the specific employment practice challenged; (2) show disparate impact; and (3) prove causation." Rose, 902 F.2d at 1424; see also Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650 (1989) (noting that appropriate statistical evidence will compare "the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market.") (internal quotations omitted).
 
 
 28
 Hicks fails to substantiate a disparate impact claim because she has not presented any evidence of disparate impact due to gender or race. The only evidence in the record reflects that African Americans comprise 37.5% of the employees in IS. There is no information regarding the job positions that these African American employees hold.
 
 V
 
 29
 Hicks argues that the low score given to her by Gallegos on the Appraisal of Promotability was an act of discrimination and retaliation. The AP was completed when Hicks applied for the position of Head of the Management Information Center. Hicks received a score of 75. The district court ruled that Hicks failed to provide sufficient evidence to support a finding of discrimination or retaliation.
 
 
 30
 Hicks relies on two factors to support her allegation that the low score was discriminatory. First, she notes that in 1987 Gallegos gave her a score of 90 on an AP. Second, she observes that the AP was not properly signed by Gallegos's superior as required by Personnel Directives.
 
 
 31
 The fact that the AP was not signed by Gallegos's superior is troubling. The second signature acts to protect the employee being evaluated by ensuring that the AP is fair and accurate. This procedural safeguard is particularly valuable in civil service jobs like those in Los Angeles County, where promotion decisions are based on evaluations such as the one in question.
 
 
 32
 Although this breach of County rules is troubling, the district court was not clearly erroneous in ruling that Hicks failed to provide sufficient evidence of discriminatory intent. This was not the only time that Gallegos failed to follow procedural rules with respect to evaluations; in fact, Gallegos often failed to give annual performance evaluations to all of his employees. Moreover, Gallegos testified that the score of 75 was based on the position for which Hicks was applying. Thus, the AP for an application for the position of Data Systems Analyst II differs from the AP for an application for the position of Data Systems Coordinator because the two positions involve different skills and responsibilities. Although we are troubled by the low score on the AP in light of the record as a whole, we cannot conclude that the district court's findings are clearly erroneous.
 
 VI
 
 33
 Section 102 of the Civil Rights Act of 1991 ("1991 Act"), which was enacted on November 21, 1991, establishes the right to a jury trial in specific cases. 42 U.S.C. Sec. 1981a(c). On November 30, 1991, Hicks requested a jury trial. The district court denied this motion on the grounds that the 1991 Act was not retroactive. Since this appeal was heard, the Supreme Court has ruled that Sec. 102 does not apply to Title VII cases that arose before the 1991 Act was enacted. Landsgraf v. USI Film Prods., 114 S.Ct. 1483 (1994). Hicks's claim that she was entitled to a jury trial therefore fails.
 
 VII
 
 34
 Hicks argues that the district court committed overt acts of bias that constitute reversible error. We disagree.
 
 
 35
 Hicks first argues that the denial of a jury trial was an act of bias. Clearly this is not the case.
 
 
 36
 Hicks next contends that the district court's sanction of Hicks's counsel for failing to timely file his Memorandum of Contentions of Law and Fact was an act of bias. Hicks does not cite any cases to support her argument that the imposition of one sanction for the failure to follow local rules demonstrates reversible bias.
 
 
 37
 Hicks next notes that at one point during the trial the district court asked several of Hicks's witnesses to leave the courtroom. Nothing in the record, however, suggests that prejudice or bias motivated this event. Instead, the record reflects that the district court suggested that Hicks's counsel ask that witnesses who had already testified leave. The court was not discourteous and Hicks's counsel did not object. It is impossible to infer prejudice from this incident.
 
 
 38
 Fourth, Hicks argues that the trial court did not permit rebuttal. This is true. However, no rebuttal was necessary in this case because the defendants did not call any witnesses, but instead presented their entire case by submitting documents and cross-examining Hicks's witnesses. Moreover, Hicks's counsel did not object to the district court's ruling at the time.
 
 
 39
 Finally, Hicks argues that the judge displayed gender bias in referring to her marriage and her baby in his ruling. Clearly the district court's comments are disturbing. However, we cannot infer reversible error from these comments. It appears that the statements regarding Hicks's marriage and her baby were based on an exhibit introduced at trial in which Gallegos noted that after Hicks got married, she didn't show for work for about a week. It further stated that she had been threatened by her spouse and mentions that at one point Gallegos thought she was pregnant. That the district court referred to these incidents is not evidence of overt bias sufficient to require reversal.
 
 VIII
 
 40
 For the reasons stated above, appellant's claims are denied and the district court's judgment in favor of the County of Los Angeles is AFFIRMED.
 
 
 
 *
 Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The work restrictions were the result of a workers' compensation claim that Hicks had filed
 
 
 [2]
 A plaintiff makes a prima facie case of disparate treatment by offering " 'evidence that indicates that "it is more likely than not" that the employer's actions were based on unlawful considerations.' " Jauregui, 852 F.2d at 1134 (citations omitted). A common way to establish an inference of discrimination is to provide evidence to meet the four requirements of the McDonnell Douglas test: (1) that the plaintiff is a member of a class protected under Title VII; (2) that the plaintiff applied and was qualified for a job for which the employer sought applicants; (3) that the plaintiff was rejected; and (4) that after the plaintiff was rejected, the employer either continued to seek applicants for the position or filled the position with an employee not of plaintiff's class. See McDonnell Douglas, 411 U.S. at 802. This test is not rigidly applied, however, and we have recognized the need to modify this test in the context of promotions. Diaz v. American Tel. & Tel., 752 F.2d 1356, 1359-61 (9th Cir.1985) (plaintiff establishes prima facie case even though individual promoted instead of plaintiff is member of same class)
 
 
 [3]
 At the outset, we must consider Hicks' contention that once a case proceeds to judgment, the issue of whether a prima facie case was made is no longer relevant. Hicks argues that because the district court concluded that she failed to make a prima facie case of disparate treatment, we must reverse. In United States Postal Serv. Bd. of Govs. v. Aikens, the Supreme Court stated that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." 460 U.S. 711, 715 (1983); see also Bouman v. Block, 940 F.2d 1211, 1223 (9th Cir.), cert. denied, 112 S.Ct. 640 (1991). Thus, under Aikens, when the court permits the entire bench trial to proceed, the relevant question for the court becomes whether the employer intentionally discriminated against the plaintiff. In this case, the district court ruled that Hicks failed to establish a showing of discriminatory intent or motive on the basis of race, sex, or retaliation. Because the district court did not focus solely on the question of whether Hicks had established a prima facie case, but also found that Hicks had failed to provide sufficient evidence of discrimination or retaliation, we need not reverse on this issue
 
 
 [4]
 Although we do not reach this issue because of the finding that the DPM I position was not filled, some disturbing evidence suggests possible discriminatory behavior at Rancho Los Amigos. Gallegos had an extremely troubled relationship with his employees in general and with Hicks in particular. Hicks had previously filed three grievances and one affirmative action complaint against Gallegos for discriminatory behavior and there is evidence that Gallegos made offensive remarks to African Americans. Most troubling of all is the fact that Gallegos did not interview Hicks for the DPM I position, but did interview Arnold Towns, an employee who had not applied for the position. Gallegos explained that out of the ten employees who applied for the job, he selected four to interview based on their experience; Hicks was not interviewed because of her lack of technical experience (as opposed to training experience) with computer operations. Whether this explanation is true we cannot say, but the use of purely subjective factors to evaluate applicants for promotion, while not illegal per se, is often a means by which criteria are manipulated in order to eliminate certain candidates from selection. Jauregui, 852 F.2d at 1135-36